RECEIVED
IN MONROE, LA
NOV 19 2007
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| SPORTING LAND, L.L.C. d/b/a COOPER ENTERPRISES AND TRIPLE S FARMS, INC. | CIVIL ACTION NO. 07-1692 |
| VERSUS | JUDGE ROBERT G. JAMES |
| CHC ENERGY, L.L.C. | MAG. JUDGE KAREN L. HAYES |

## RULING

Pending before the Court is Plaintiffs Sporting Land, L.L.C. and Triple S Farms, Inc.'s request for preliminary injunctive relief, see [Doc. No. 1], against Defendant CHC Energy, L.L.C. ("CHC"). In response, Defendant has filed a Motion for Dismissal or Stay, In the Alternative ("Motion for Dismissal") [Doc. No. 7].

An evidentiary hearing was held on October, 18, 2007, before the undersigned. Briefing is now complete.

For the following reasons, Defendant's Motion for Dismissal is DENIED, and Plaintiff's request for injunctive relief is GRANTED.

## I. FACTS AND PROCEDURAL HISTORY

CHC is in the business of coal-bed methane gas mining. This process begins by drilling a water well. It is usually 6-18 months before enough water is pumped out, so that methane gas can be pumped out. Each well has a wellhead, a drivehead, flow lines from the wellhead, a small

1

separator, a gas meter, electrical lines, transformer, and breaker box. Water is pumped from the wells, collected in three tanks, and then disposed of in the salt water disposal well. The disposal well is located within the boundaries of a central facility, along with the compressor.

CHC obtained a mineral lease from Tensas Delta Exploration Company, LLC ("Tensas Delta") in the southern part of Richland Parish, known as Dave's Bayou. Plaintiff Sporting Land, L.L.C. ("Sporting Land") had previously purchased land from Tensas Delta pursuant to a cash sale deed in which Tensas Delta retained mineral rights.

David Cooper ("Cooper") is the sole member of Sporting Land. He testified that the property owned by Sporting Land was purchased for development as an on-going farming operation for rice, complemented with hunting for his family. After the purchase, the property was placed in government land conservation programs. At this time, the property is hunted for ducks in the morning and deer in the afternoon. Sporting Land leases blinds for duck hunting, but lessees are not allowed to hunt nor ride ATVs or mules in the afternoon. Cooper explained that this requirement allows the ducks a chance to rest, so that they will not leave the property.

On November 14, 2004, Karl Weber ("Weber") and Dean Foss ("Foss") met Cooper in his trailer at his hunting camp. Weber is a partner in Harvest/Clarus CBM, LLP ("Harvest"), the operating manager for CHC. He is responsible for managing the books and records, designing and building the pipeline, and helping with operation. Foss is also employed by Harvest.

During their meeting, Weber, Foss, and Cooper discussed an easement. Cooper expressed concern with having heavy equipment on the property during the hunting season.

Based on Weber's notes from the meeting, he drafted a letter dated November 19, 2004, from Weber to Cooper. The letter included a drilling restriction.

2

At some point, Cooper and Foss had a conversation in which Cooper understood that the wells could be checked through the use of telemetry without the necessity of a daily physical check.[1]

According to Weber, telemetry is used to gather data, but it is insufficient to monitor everything on a daily basis. For example, the telemetry does not monitor motor rpms, leaks, pipes that may burst from corrosion, whether the stuffing box is functioning properly, and whether salt water is leaking. If CHC employees and/or contractors cannot visit the wells daily, then the wells will be shut down.

Weber's testimony was supported by Ted Ellison ("Ellison") of CHC. Ellison testified that he mentioned to Cooper that CHC anticipated putting in some telemetry, but he never said that he would not need to set foot on the property. CHC has a contractor (a "pumper") who inspects the wells. The wells must be physically inspected to ensure that the stuffing box has no corrosion or leaks, that the drive belts are operating properly, the fluid levels are correct, and that the valves and fittings are not leaking gas or water.

Weber's November 19, 2004 letter was later converted into the Surface Use and Damage Agreement and Easement ("Easement"). The Easement, entered into between CHC and Cooper Enterprises, was signed January 13, 2005. Cooper Enterprises is not a legal entity, but is merely the name on the door of Cooper's office. Sporting Land owned 4,200 acres at the time, but Foss had asked if the name Cooper Enterprises could be used in the Easement to ensure that the "Cooper" name was in the land records.

The drilling restriction became provision L in the Easement. Provision L states:

Notwithstanding anything to contrary herein, Operator agrees to not engage in

---

[1] Foss did not testify, but it was clear that this was Cooper's understanding.

3

drilling and construction operations from November 1st through January 15th, during the water fowl hunting season. All other operations requiring access to individual Well Sites will also be limited during this period to those operations requiring immediate attention (such as, for example, a well going off production) or an emergency situation. However, Operator will notify the Landowner prior to commencing such operations. The access restriction provided . . . however, does not include operations or activities involving the Central Facilities or the Disposal Wells.

During the remainder of the hunting season for 2005, CHC did not operate.

During the 2005-2006 hunting season, CHC did operate. CHC drilled a test well where the central facility is located, pumped on a continuous basis, and produced gas. CHC operators did not make specific arrangements with Cooper.

On June 13, 2006, Plaintiff Triple S Farms, Inc. ("Triple S") purchased approximately 2,700 acres from Sporting Land, subject to the Easement[2]. Jimmy Street ("Street"), a Director for Triple

---

[2]Provision V of the Easement states that it is

binding upon the parties hereto, and upon their . . . successors . . . and assigns. This Agreement and the rights of the parties may be assigned in whole or in part except as provided in Section G [on payment of royalties] . . . All provisions contained within this Agreement are explicitly and irrevocably attached to the Subject Lands, shall be covenants running with the Subject Lands, and shall survive as long as Operator has producing wells and/or facilities located on any of the Subject Lands or adjacent lands. **In the event of sale of all or any portion of the Landowner's lands, the provisions of this Agreement are expressly attached to those lands.**

(emphasis added). Thus, once Sporting Land sold part of its land to Triple S, the Easement indicates that Triple S should have succeeded to the obligations and rights of Sporting Land (a/k/a Cooper Enterprises).

The Court recognizes that, under Louisiana law, actions arising from a breach of contract or lease of property are classified as personal rights. Prados v. South Central Bell Tel. Co., 329 So.2d 744, 749 (La.1975) (citing Leonard v. Lavigne, 245 La. 1004, 162 So.2d 341 (1964)). While real rights and obligations transfer from the seller to the buyer without any special provision, La. Civ. Code art. 1763, personal rights do not transfer without special assignment of rights and obligations to the buyer. La. Civ. Code art. 1764. Nevertheless, the rights and obligations at issue are "heritable." See La. Civ. Code Ann. art. 1765 ("An obligation is

4

S, testified that the most important aspect of this investment was the hunting.[3] Following the purchase, Sporting Land retained approximately 1,500 acres subject to the Easement.

After Sporting Land sold land to Triple S, Weber came to Cooper and asked him to sign a Memorandum of Understanding. Weber indicated that the memorandum would put the public, particularly a potential buyer, on notice that he or she needed to check on the Easement. This memorandum was filed on August 22, 2006.

During the 2006-2007 hunting season, CHC rented a space in a hunting camp on Sporting Land property. CHC had begun operating. CHC had just completed drilling and was doing work overs and pump installation. Employees and contractors checked wells daily.

During this time, Weber was aware that Cooper had complaints about persons who were driving onto the property. In response to this concern, CHC self-imposed road restrictions and made all contractors agree to the restrictions.

---

heritable when its performance may be enforced by a successor of the obligee or against a successor of the obligor. Every obligation is deemed heritable as to all parties, except when the contrary results from the terms or from the nature of the contract. A heritable obligation is also transferable between living persons.").

In this case, Sporting Land transferred by Warranty Deed to Triple S, "all of their rights, title and interest in and to the property . . . ." [Defendant's Exhibit 3]. Thus, the Easement between Sporting Land and CHC specifically contemplates that it will "run with the land" and be transferred to buyers, and the Warranty Deed between Sporting Land as seller and Triple S as buyer contemplates that Triple S succeeds to Sporting Land's "rights." To the extent that CHC contends Triple S is not a proper plaintiff, the Court finds their contention to be without merit.

[3]Defendant's counsel elicited testimony from Jimmy Street that he is not a shareholder of Triple S. However, a review of the presumptively correct Louisiana Secretary of State website, see www.sos.louisiana.gov, reveals that Jimmy Street is both a registered agent and director of Triple S. Therefore, the Court finds that, to the extent Defendant sought to make this an issue, Jimmy Street is a proper representative to testify about the intent of Triple S Farms in purchasing acreage from Sporting Land, L.L.C.

CHC also used certain routes and times of travel during the 2006-2007 hunting season in order to minimize interference with hunting. However, Weber did not personally speak with Cooper or Street about these routes and is unaware if either authorized the routes. Ellison admitted that there were a couple of instances when CHC employees or contractors were not in compliance with the Easement as to the times for inspection. However, he said that they tried to honor the Easement and to take other steps to work with Cooper and Street. For example, CHC began using a mule to access wells after Cooper and Street pointed out that hunters were limited to ATVs or mules.

During the 2007-2008 hunting season, Weber and Ellison testified that a CHC contractor and/or employees would continue to check the wells daily. According to Weber, if the wells are not checked daily, then they will have to be shut down, resulting in lost revenue and fixed costs of $190,000 and the possibility of a $4.1 million investment lost from the nine wells.

However, Ellison does not anticipate drilling new wells or conducting other more extensive activity unless a well goes off production or there is an emergency necessitating a work over.[4]

## II.   LAW AND ANALYSIS

### A.   Motion for Dismissal

Before proceeding further, the Court must address Defendant's Motion for Dismissal. Defendant contends that the Court should dismiss this matter because Plaintiff failed to comply with provision O of the Easement. That provision states as follows:

> If the Landowner believes that the Operator is in default under any provision of this Agreement, then as a condition precedent to Landowner initiating any legal proceeding, Landowner shall first give at least sixty (60) days advance written notice to Operator, at the Operator's address . . . specifying the default claimed by the

---

[4] Ellison explained that to perform a work over of a well, CHC brings in a work over rig and pulls the drive hole off.

6

Landowner, providing Operator an opportunity to dispute, cure, correct or resolve the claimed default.

However, Plaintiff responds that there is no current "default" in this case. Rather, Plaintiff initiated this action to prevent a default.

The Court agrees with Plaintiff. Plaintiff's action is in the nature of anticipatory breach of contract and was brought on the basis that Defendant has indicated that it will breach the contract. Under these circumstances, provision O is not applicable.

Further, although Louisiana case law treats an anticipatory breach as if a breach has actually occurred, case law also states that a party's breach relieves the other party from performing under the contract. See Fertel v. Brooks, 2002-0846 (La. App. 4 Cir. 9/25/02); 832 So.2d 297, 305-306.

Finally, it is the clear intent of this provision to allow the parties the opportunity to reach some amicable resolution without court interference. As set forth in the facts, Cooper gave notice in early August or September of Plaintiffs' intent to enforce provision L of the Easement. More than sixty (60) days have passed since that time and, following the hearing, the parties tried to reach an amicable resolution without a ruling from the Court. They were unable to do so. Any attempt to enforce provision O at this point is merely a delaying tactic by CHC. Accordingly, Defendant's Motion for Dismissal is DENIED.

### B. Federal Law Applies to Issuance of Injunctions

The Court now turns to Plaintiff's request for injunctive relief. First, Plaintiff contends that this Court, sitting in diversity, should apply state law on preliminary injunctions. Defendant contends that federal law applies.

However, Federal Rule of Civil Procedure 65 governs the issuance of a preliminary

7

injunction. "Concerning matters covered by the Federal Rules of Civil Procedure, . . . [i]t is settled that if the Rule on point is consonant with the Rules Enabling Act, 28 U.S.C. § 2072, and the Constitution, the Federal Rule applies regardless of contrary state law." Gasperini v. Ctr. For Humanities, Inc., 518 U.S. 415, 428 n. 7, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996)(citing Hanna v. Plumer, 380 U.S. 460, 469-74, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965)); see also SEMCO, L.L.C. v. Ellicott Mach. Corp. Intern., 1999 WL 493278 at *2 (E.D. La., July 9, 1999) ("While the substantive issues pertaining to interpretation of the Contract are resolved under Louisiana law, the propriety of a preliminary injunction presents an issue of procedure, and this Court must follow federal procedure.").

The Court must apply federal law on the issuance of preliminary injunctions.

### C. Preliminary Injunction

A preliminary injunction is an extraordinary remedy that should not be granted unless the movant demonstrates by a clear showing:

(1) a substantial likelihood of success on the merits;

(2) a substantial threat of irreparable harm if the injunction is not granted;

(3) that the threatened injury outweighs any harm that may result from the injunction to the non-movant; and

(4) that the injunction will not undermine the public interest.

Valley v. Rapides Parish School Bd., 118 F.3d 1047, 1051 (5th Cir. 1997). The party seeking the preliminary injunction must "clearly carry the burden of persuasion on all four . . . prerequisites." Cherokee Pump & Equipment, Inc. v. Aurora Pump, 38 F.3d 246, 249 (5th Cir.1994) (citing Mississippi Power & Light v. United Gas Pipe Line Co., 760 F.2d 618 (5th Cir.1985)).

### 1. Likelihood of Success

Plaintiffs brought this lawsuit solely to request injunctive relief. They request that CHC be preliminarily and permanently enjoined from "engaging in drilling or construction operations on the property in question from November 1, 2007[,] through January 15, 2008, and the same time frame each year thereafter." [Doc. No. 1, Exh. B, p. 4]. Plaintiffs further request that CHC be permanently enjoined, "limiting its access to individual well sites from November 1, 2007[,] through January 15, 2008[,] and thereafter, except for operations requiring immediate attention or in emergency situations." [Doc. No. 1, Exh. B., p. 4].

Plaintiffs, while seeking injunctive relief, appear to argue under a theory of anticipatory breach of contract. Plaintiffs argue that CHC will breach provision L of the Easement based upon CHC's prior conduct and Weber's statements to Cooper.

The doctrine of anticipatory breach of contract "applies when an obligor announces he will not perform an obligation which is due sometime in the future. The obligee need not wait until the obligor fails to perform for the contract to be considered in breach." Gulf Coast Bank & Trust Co. v. Rick Granger Enterprises, 2001-0656(La. App. 3 Cir. 10/31/01), 800 So.2d 402, 404 (quoting B & G Crane Service, Inc. v. Aetna Cas. and Sur. Co., 586 So.2d 710, 712 (La. App. 3 Cir.1991), writ denied, 590 So.2d 591 (La.1992)). "Where a party refuses and does not merely fail or neglect to comply with his contractual obligation, his refusal constitutes an active breach of the contract, which relieves the other party of the obligation of continuing to perform under the contract." Fertel v. Brooks, 2002-0846 (La. App. 4 Cir. 9/25/02); 832 So.2d 297, 305-306 (citing Andrew Dev. Corp. v. West Esplanade Corp., 347 So.2d 210, 212-13 (La.1977)).

From the testimony adduced at the hearing, CHC performed operations during the 2006-2007

hunting season which were not permitted under provision L of the Easement. Further, while Ellison testified that he did not anticipate any drilling during the 2007-2008 hunting season, there were a number of work overs which occurred during the 2005-2006 hunting season, and it was unclear to the Court that these work overs were "emergency situations."

Under these circumstances, the Court determines, at least preliminarily, that Plaintiffs have a substantial likelihood of success on the merits of an anticipatory breach of contract claim.

### 2. Irreparable Harm

Plaintiffs must also show that they will suffer irreparable harm if the preliminary injunction is not granted. In fact, they seek only injunctive relief in this cases.

A party's "'injury is 'irreparable' only if it cannot be undone through monetary damages.'" Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana, 762 F.2d 464, 472-73 (5th Cir. 1985) (quoting Deerfield Med. Ctr. v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. 1981)). At least one Louisiana district court has recognized that interference with hunting rights may be an irreparable injury. See Buckskin Hunting Club v. Bayard,[5] 2003-1428 (La. App. 3. Cir. 03/03/04); 868 So.2d 266, 268 (Permanent injunction granted to lessee hunting club to prevent hunters who were not members from hunting on land in question).

In this case, the Court finds that Plaintiffs have established that they will suffer irreparable harm if provision L of the Easement is not enforced during the 2007-2008 hunting season. While some land was leased to duck hunters, and the loss of these leases can be adequately compensated with monetary damages, Plaintiffs' chief concern is with the hunting rights of its members, shareholders, and directors. CHC has argued strenuously that a limited liability company or a

---

[5] The Court cites this case only for the limited reason assigned.

10

corporation cannot have a "loss of enjoyment" of hunting rights.

However, the Court's focus in an injunction is whether the harm alleged is irreparable, and one Louisiana court has recognized that this type of harm is irreparable to an organization lessee. The Court notes that a corporation or a limited liability company can act only through its members and agents, and, in this case, the sole member of the Sporting Land and the director and treasurer of Triple S have asserted rights clearly important to those entities and contemplated in all transactions involving the land in question.

If the Court were not to issue the injunction, then Plaintiffs would lose the very right that Sporting Land, through Cooper, worked so diligently to protect–the right to hunt undisturbed during a limited time period each year. It was undisputed by the parties that from the very beginning this issue was of utmost importance to Cooper.

Accordingly, the Court finds that Plaintiffs have made a sufficient showing to establish they will suffer irreparable harm without issuance of the preliminary injunction.

### 3.   Threatened Injury versus Harm

Next, Plaintiffs must show that their threatened injury outweighs any harm to CHC. CHC put on evidence that if its pumper were not allowed to check the individual wells on a daily basis, then it would have to shut down operations, causing the wells to fill with water. It that occurred, then CHC would suffer very significant monetary damages.

However, as the Court reads provision L of the Easement, CHC is permitted to check its wells on a daily basis because (1) a daily check does not appear to be an "operation" contemplated by the provision, and (2) even if it were an "operation," it is one that requires "immediate attention" to prevent a total loss.

11

Therefore, the Court finds that a preliminary injunction preventing Plaintiffs' threatened injury of loss of hunting rights outweighs the harm to CHC in complying with the Easement.

### 4. Public Interest

Finally, the Court must consider whether the injunction would undermine the public interest. The interests in this case are largely private–the hunting rights of landowners versus the drilling rights of a gas company. Although CHC points out that there is some public interest in salt water contamination if it is not allowed to check the wells to ensure there is no leak, the Court's injunction addresses this concern. Therefore, the Court finds that the public interest would not be undermined in this case by enforcing the Easement and granting a preliminary injunction to Plaintiffs.

### III. CONCLUSION

For the foregoing reasons, Defendant's Motion for Dismissal is DENIED, and Plaintiff's request for preliminary injunctive relief is GRANTED. Defendant is hereby ENJOINED from taking any actions in violation of provision L of the January 13, 2005 Surface Use and Damage Agreement and Easement. CHC is permitted to check its wells on a daily basis. However, to preserve the intent of the parties under provision L, CHC must do so at a time and in a manner calculated to minimize any impact on hunting activities.

MONROE, LOUISIANA, this  16  day of November, 2007.

ROBERT G. JAMES
UNITED STATES DISTRICT COURT